IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| TONYA FOREMAN VENISEE and LENDALY LUNA, | |
| Plaintiffs, | CIVIL NO. _____ |
| v. | |
| PROGRESS RESIDENTIAL, LLC, | **JURY TRIAL REQUESTED** |
| Defendant. | |

## COMPLAINT

Plaintiffs Tonya Foreman Venisee ("Venisee") and Lendaly Luna ("Luna") (Venisee and Luna collectively, "Plaintiffs") file the following Complaint against Progress Residential, LLC ("Progress Residential" or "Defendant"), seeking damages and equitable relief as set forth below.

## Nature of Complaint

1.

This action is brought pursuant to the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII") seeking back pay, front pay in

lieu of restatement, compensatory and punitive damages, and other available relief in relation to claims of race discrimination and retaliation on behalf of each of the Plaintiffs Venisee and Luna. This action is also brought pursuant to the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA") and the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.* ("FMLA").

## **The Parties**

2.

Venisee is a citizen of the United States and a resident of the State of Georgia residing in Fulton County.  She is a former employee of Defendant working from its Atlanta regional office. Venisee submits herself to the jurisdiction of this Court.

3.

Luna is a citizen of the United States and a resident of the State of Georgia residing in the City of Buford.  She is a former employee of Defendant working from its Atlanta regional office. Luna submits herself to the jurisdiction of this Court.

4.

Defendant Progress Residential, LLC, which operates as home rental management company, is a foreign limited liability company organized under the laws of the State of Arizona with its principal place of business in Scottsdale,

Arizona. Progress Residential may be served with process through its Georgia registered agent for service of process, Corporation Service Company, at 2 Sun Court, Suite 400, Peachtree Corners, GA 30092.

## **Jurisdiction and Venue**

5.

This Court has personal jurisdiction over Progress Residential because Progress Residential operates as a foreign limited liability company in the state of Georgia from its Atlanta regional office in Alpharetta, Georgia.

6.

This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331 because the claims asserted arise under federal law.

7.

This is an appropriate venue for all of Plaintiffs' claims as the regional judicial district in which the Defendant operates and in which the events and omissions giving rise to Plaintiffs' claims occurred.

**Statutory Coverage**

8.

Both of the Plaintiffs were, at all times relevant hereto, employees entitled to the protections of Title VII and ERISA and were eligible employees within the meaning of the FMLA.

9.

Progress Residential was at all times relevant hereto an employer within the meaning of Title VII and ERISA, and was a covered employer under the FMLA.

**Administrative Proceedings**

10.

Plaintiffs Venisee and Luna each filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on August 25, 2020 in relation to claims for race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.

11.

The EEOC issued each of the Plaintiffs a Notice of Right to Sue on or about September 23, 2021, and Plaintiffs timely filed this Complaint within 90 days of their receipt of those Notices.

**The Facts**
**The Racist Attitudes Toward and Treatment of Plaintiffs By Co-Workers and
Superiors, and Progress Residential's Tolerance of Such Behavior**

12.

Progress Residential hired Luna as a Human Resources Generalist on April 29, 2019. Progress Residential hired Venisee as Senior Talent Acquisition Recruiter on February 5, 2019. Both Plaintiffs began suffering from a hostile work environment and race discrimination almost immediately after they began working for Defendant.

13.

In approximately March 2019, approximately one month after she started working there, Patricia Shelton ("Ms. Shelton"), the Regional Vice President and a top executive working from the Atlanta location, singled Venisee out to falsely accuse her of an alleged email issue. Ms. Shelton yelled at Venisee using highly inappropriate words and tone.

14.

This incident was only the beginning of Ms. Shelton consistently targeting and criticizing Venisee for false or otherwise pretextual reasons. Ms. Shelton did not subject the white similarly situated employees to the same inappropriate and abusive

treatment, despite the fact that many of them consistently ranked below Venisee's performance ratings.

15.

Just a short time later, another employee overheard Ms. Shelton stating to Jennifer Krenson ("Ms. Krenson"), the Area Operations Director in Atlanta, with reference to Venisee, "I knew we couldn't have someone of that shade represent us from HR in Atlanta."

16.

Numerous field employees shared with Venisee that Ms. Shelton and Ms. Krenson had told them not to come to Venisee or to Luna because they were "not real HR," despite both Plaintiffs' qualified positions in the Human Resources department.

17.

None of the employees who conveyed this to Venisee or Luna indicated that they had ever before been instructed not to report to the Human Resources Generalist and Senior Talent Acquisition Recruiter positions prior to Plaintiffs filling those roles. As Venisee and Luna were the only black members of the Human Resources department, they were singled out and subjected to racially motivated attempts to

have their job functions restricted, despite being highly qualified and holding among the strongest performance records.

18.

In approximately May or June 2019, corporate HR, which consisted of Chief Human Resources Officer Kim Edwards ("Ms. Edwards"), Human Resources Director Joyce Nemitz ("Ms. Nemitz"), and Human Resources Manager Joy Carpenter ("Ms. Carpenter"), came to Atlanta to speak with Ms. Shelton about her racist behavior.

19.

Ms. Shelton refused to allow Venisee in the room while she was meeting with corporate HR about her racist behavior, claiming that she did not feel the need to meet with someone at Venisee's level. Ms. Shelton refused to mediate or find any way toward resolution regarding her racist treatment towards Venisee and other employees.

20.

Instead of taking action to put a stop to Ms. Shelton's racially discriminatory treatment of Venisee and other black employees, corporate HR took her out to lunch.

21.

Instead of seeking ways to cease the harassment and discriminatory treatment, Ms. Nemitz and Ms. Edwards informed Venisee to "deal with it" because "she is the leader of the market and you [Venisee] need to find a way to adjust to how they treat you [Venisee] and operate," including the racism, harassment, and daily harsh treatment.

22.

On another occasion, Venisee tried to diligently inform Ms. Nemitz about the ongoing issue with racism at the Atlanta location. In response, Ms. Nemitz made it clear that Progress Residential was more important than the livelihood and safety of the individual clients, by stating, "We are here to protect the company." Venisee asked, "Even against wrong and illegal doings?" and Ms. Nemitz replied, "We are here to protect the company at all costs even if they are wrong."

23.

Ms. Nemitz plainly knew of the race discrimination that Venisee was experiencing as a Progress Residential employee, as she expressed directly to Luna at least one time her concern that Venisee was going to quit her job and file a lawsuit regarding the race discrimination that she both experienced and witnessed.  Yet, she did nothing to stop or remedy the discrimination.

24.

Ms. Carpenter, who is bi-racial, also expressly acknowledged the ongoing racially disparate treatment and hostile work environment at Progress Residential, stating to Venisee, "You know they don't care to make any changes or won't do anything for 'our kind." Ms. Carpenter went on to express her own concerns over Ms. Edwards and Ms. Nemitz but advised Venisee that she should just "suck it up" to keep her job, specifically stating, "just do your job and let it go."

25.

In addition to condoning race discrimination against Venisee and Luna, Defendant's top-level executives also refused to acknowledge complaints of race discrimination made to HR by other employees, and threatened employees who attempted to report harassment and racist behavior in an effort to stifle their voices.

26.

For instance, numerous employees told Venisee that after anonymous complaints were made about racism in the Atlanta office, Ms. Krenson threatened all of the employees, stating something similar to, "If you go to HR again, it will be consequences and conversations in my office."

27.

Likewise, on multiple occasions throughout the Plaintiffs' employment with Defendant, Ms. Krenson was heard or reported to warn against reporting disparate treatment to HR, saying things like, "We wash our dirty dishes in-house and no one is to go to HR or Mickey [Mr. Cummings, the EVP over Field Market Offices] or to tell corporate anything that goes on in this market, or there will be consequences."

28.

Other minority employees frequently reported to Venisee and Luna, in their capacity as HR managers, that they felt they could not voice their concerns about race discrimination for fear of their jobs, based on these comments and others by senior leaders.

29.

While some employees stated that they felt they needed to remain silent about the discriminatory treatment they were experiencing, others did continue to complain either formally or informally, despite Ms. Krenson's threats.

30.

For example, on or about June 3, 2019, Luna conducted a meet-and-greet meeting with minority (Hispanic) employee Will Pichardo. During this meeting, Mr. Pichardo reported to Luna that comments and jokes had been made about his dialect

by white employees, specifically Ms. Krenson and Melissa Bruce, the Assistant Portfolio Operations Director.  He stated that "everyone laughs about it" which makes him uncomfortable.

31.

Additionally, Mr. Pichardo told Luna that he felt his job would be at risk if he complained formally, because Ms. Krenson had told him, "Do not go to HR with concerns, let's handle it and have no HR involved."

32.

On another occasion, Luna met with another minority employee, Rodney Giles, who shared with Luna his sense of a racial divide in the Atlanta office, stating, "We're the workers and they're the leaders."

33.

Luna immediately shared both of these concerns regarding racism in the workplace with Ms. Carpenter, who was also her direct supervisor. She received no response.

34.

Despite Ms. Krenson urging that matters would be handled "in-house," no concerns were ever acknowledged or addressed when brought to upper management's attention.

35.

A few white employees also expressly acknowledged the rampant racism in the Atlanta office. For example, employee Stacie Primm expressed to Venisee that she did not approve of the racist behavior and attitudes at Progress Residential. She continued to say things like "I know I look like more of the same (i.e. a white woman) but I am not and I will make a change around here because I see the racism." However, Ms. Primm never actually spoke up about the racism to executive leadership because she knew she would put her job at risk if she spoke up.

36.

By contrast, Venisee's supervisor Kathy Rupar spoke up for Venisee against the racist treatment, and Ms. Rupar was summarily terminated as a result.

### Specific Examples of Race Discrimination & Harassment: The Banana Incident

37.

The dismissive and toxic culture at Progress Residential made some white employees comfortable enough to blatantly harass minority co-workers.

38.

As an example, on June 6, 2019, white employees Melissa Bruce and Stacie Primm disrupted Luna and Venisee while they were working, coming multiple times

into Plaintiffs' offices laughing loudly. They eventually whispered to Venisee that she should go outside to see what they did to Luna's car.

39.

Venisee attempted to ignore them and to keep working, but Melissa Bruce and Stacie Primm continued to disrupt by coming into the office again, laughing. This time, they interrupted Luna while she was on the phone and told her, "Come see the monkey car," and "You better go check before it starts raining, you don't want it to get wet."

40.

Concerned, Luna put her call on mute momentarily and asked Venisee to go check on her vehicle. Venisee immediately went and was appalled to see that there were three bananas on Luna's car – two under the windshield wiper and one stuffed in the driver door handle, along with a yellow sticky note which said, "Monkey Business."

41.

Venisee returned to the office disgusted and aghast, retrieved her phone, and went back outside to take pictures so that she could show Luna (who was on a business phone call) what had been done to her car.

42.

When Venisee went out to take the pictures, she passed Ms. Krenson sitting in her car nearby. Ms. Krenson asked Venisee what was going on. Venisee told Ms. Krenson that someone had put bananas on Luna's car with a note saying "Monkey Business." In response, Ms. Krenson only laughed and shrugged it off.

43.

The clear and blatant usage of a racial slur along with the degrading mess that was left for Luna to clean was done to demean, ridicule and intimidate Luna, Venisee, and other racial minority employees.

44.

Luna tried to continue working that day but was so upset and shaken that she needed to go home early. When she arrived at her car, she saw that her co-workers had left the bananas for Luna to clean up herself.

45.

That same day, Luna reported the incident to Ms. Carpenter, expressing that she was extremely offended and concerned by the racist harassment. Ms. Carpenter responded, "That's just how they are in that market, you know they don't like our kind."  Instead of receiving assurance that the racism would be addressed, Luna was only told to "put it behind" her and move on from the incident.

46.

In response to the banana incident, Venisee also addressed the perpetrators, Melissa Bruce and Stacie Primm, directly, expressing that she was hurt, embarrassed and offended. Melissa Bruce only told Venisee that she was being sensitive.

47.

After laughing about the incident to Venisee, Ms. Krenson never acknowledged it again or addressed the hostile work environment that the incident was born from and continued to create.

48.

On June 10, 2019, the following Monday, the white employees involved in the banana-related harassment circulated emails among themselves and to Luna with the subject line of "I will never look at a banana the same! HAPPY MONDAY!!"

49.

Luna was again shaken and upset by the continued racism and told Venisee what happened. Luna also informed her co-workers, including the primary perpetrator Ms. Bruce, that she was offended by the emails. As before, they did not care.

50.

When Luna expressly told Ms. Bruce that she did not appreciate the bananas being put on her car or think it was the slightest bit funny, Ms. Bruce responded saying "I think it's f**king hilarious."

51.

Plaintiffs' complaints about the banana incident and the emails were brushed aside and ignored, and no steps were taken to acknowledge or correct the racism.

### Specific Examples of Race Discrimination & Harassment:
### The Roach Incident

52.

Sometime after the banana incident, Progress Residential hired another minority employee, Valecia Swift, to fill the Assistant Portfolio Operations Director position vacated by Stacie Primm when she left the company. Venisee was involved in the hire of Valecia in her capacity as Senior Talent Acquisition Recruiter.

53.

When Stacie Primm contacted Venisee in relation to the recruitment of Ms. Swift, Ms. Primm said, "I referred my friend [Valecia] to replace me, but I can't tell Ms. Krenson she is black because she won't meet her or even consider her if she knows Valecia is black." Ms. Primm made this statement to both Venisee and Luna,

and when they asked her how she knew that, she said she could not tell them how she knew, but that she "just know[s]."

54.

Shortly after Valecia's hire, white employee Melissa Bruce, upon seeing an insect in her office, said to Valecia loudly and with disdain, "I didn't have roaches in my office until you moved in."

55.

This derogatory remark was highly offensive not just to Valecia but also to Venisee, Luna, and multiple other minority employees who overheard the remark and became upset. One of those employees, LaLetha Cunningham, called in to HR on the verge of tears.

56.

Venisee and Luna received more than one complaint about this incident, and they escalated the complaints to corporate HR. During that process, Plaintiffs reminded corporate HR of the banana incident, which had never been investigated or pursued in any manner.

57.

Corporate HR did not acknowledge the roach incident or take any immediate steps to address the ongoing disparate treatment towards the minority employees.

## **Internal and External Investigations**

58.

Near the end of July 2019, Progress Residential conducted its first internal investigation into the complaints of race discrimination/harassment brought to light by Plaintiffs. Venisee and Luna initially met virtually with Ms. Nemitz and Ms. Rupar, who led the investigation, but they later came to Atlanta to meet with affected individuals personally.

59.

Ms. Nemitz and/or Ms. Rupar warned Ms. Bruce in advance that that there would be an investigation into the allegations of race discrimination and harassment, some of which implicated her directly.   In providing an advance warning, the Company gave Ms. Bruce time to coordinate her "story" with her peers.

60.

When they came to Atlanta, Ms. Nimitz and Ms. Rupar refused to interview Plaintiffs outside the presence of Ms. Shelton. Ms. Shelton was visibly aggravated by having to participate in the process and criticized and attempted to intimidate Plaintiffs so as to prevent them from sharing openly the truth regarding the racism running rampant throughout the Atlanta office.

61.

Ms. Nimitz and Ms. Rupar interrogated Plaintiffs as part of this "investigation" for over three and a half hours without any breaks. Plaintiffs were treated so harshly during those meetings that they suffered from severe emotional distress and sleep deprivation for the weeks afterwards and were forced to seek counseling.

62.

During the internal investigation, Ms. Shelton and Ms. Krenson accused the Plaintiffs and other minority employees of being the source of the problems, rather than the perpetrators of the discrimination.

63.

Ms. Nemitz shared these accusations with Luna and told her that Ms. Krenson wanted someone in HR who would "be on her side" and would cover things up for her. Ms. Rupar and Ms. Nemitz both explained to Venisee and Luna that neither Plaintiff was welcome in Atlanta anymore because of Ms. Shelton and Ms. Krenson not wanting them there due to their race and their complaints of race discrimination.

64.

After the internal investigation, the Company hired outside counsel from the law firm Ogletree Deakins to come in and conduct a further investigation.

65.

Plaintiffs were again interrogated for an extended period of nearly four hours without any breaks.

66.

In contrast, when Melissa Bruce, the primary perpetrator of the racism during the banana and roach incidents, was finally questioned for the first time, she was only questioned for an hour and half and was given multiple breaks.

67.

Ms. Bruce's story changed multiple times throughout the investigation.  She first claimed that Luna put the bananas on her (Melissa Bruce's) desk first, then that her co-worker Stacie Primm had brought them, and then finally admitted that she herself brought them. None of her varying stories ever explained why the bananas were on the vehicle with the "Monkey Business" note.

68.

Many of the victims of race discrimination were neither contacted nor interviewed in this investigation.

69.

Neither Plaintiff was ever informed of the results of the investigation.

70.

Defendant did not take any steps to discipline the perpetrators of the race discrimination.

71.

Defendant did not take any steps to otherwise address or stop the discriminatory and hostile work environment.

72.

Venisee and Luna suffered a series of punitive employment actions in the months that followed their complaints and the ensuing investigation, including continued intimidation and ridicule by Ms. Shelton and Ms. Krenson.

73.

Around this time, Luna sent Ms. Nemitz a Human Capital Report, which tracked all employee relations matters that had been reported to Luna or that she was in the process of handling or investigating.

74.

After receiving this specific report, Ms. Nemitz called Luna and instructed her to remove anything that did not have to do with employee performance or corrective action.  To ensure she understood correctly, Luna replied, "You mean you want me

to remove anything having to do with race?"  Ms. Nemitz responded, "Just only include employee performance and corrective action."

75.

Compiling and sending Human Capital Reports was a part of Luna's job duties that she had routinely done prior to this conversation, yet this was the first time she had been instructed to remove all complaints related to race, notably during corporate HR's internal investigation, and specifically following the banana and roach incidents and after Luna was informed that white employees would mock Will Pichardo's Hispanic accent.

76.

This was another attempt by Progress Residential to silence minority voices and to inculcate an environment in which white leadership could promote racist views.

**Retaliation and Removal from Atlanta Office**

77.

Shortly after the conclusion of the investigation, Progress Residential retaliated against Venisee and Luna for their complaints about race discrimination and harassment by removing them from the Atlanta office and forcing them to work remotely. Almost immediately, management began shutting Plaintiffs out from

important meetings and disrupted their ability to communicate with the office by refusing to respond to many of their emails and phone calls.

78.

Despite management purposefully making it difficult for Plaintiffs to perform their jobs, Plaintiffs persisted and continued to work hard to do their best at their duties.

79.

Even while not physically in the office, Plaintiffs continued to receive disparate treatment. As one example, Mr. Cummings, the EVP over Field Market Offices and a white executive, told Venisee that she and other racial minorities were "BMWs" which stood for "bitch, moan and whine."

80.

As another example, in November 2019, Progress Residential hired a new HR Business Partner, Victor Perez.  Mr. Perez contacted Luna almost daily for history and advice on how to handle concerns arising out of the Atlanta Market.  He shared with Luna that Ms. Nemitz had told him she did not want Luna talking with people in Atlanta. Mr. Perez also expressed to Luna that he could see why Atlanta had so many HR concerns given their behaviors and practices.

81.

Since Mr. Perez relied heavily on Luna's input, Luna ended up having to handle most of the work surrounding these issues that Mr. Perez then claimed as his own "solutions" to report to management. As a result, Luna was removed from having any direct input on the Atlanta market but was still responsible for the work without the recognition for her efforts.

## Progress Residential's Denial to Plaintiffs of Opportunities and Promotions, and Its Ultimate Termination of their Employment

82.

Progress Residential denied employment advancements to Plaintiffs multiple times to discriminate and retaliate against Plaintiffs for their race and race-based complaints to HR.

83.

For example, Luna attended leadership training in Orlando with several senior HR leaders near the end of June 2019. During this time, she had the opportunity to speak with Ms. Nemitz who informed Luna of a new HR Business Partner position that would soon be posted to the Atlanta location. Luna was well-qualified for this position and expressed her desire to apply for it.

84.

Later that day, during a dinner with Ms. Nemitz and Ms. Edwards, Luna shared many of the race-related concerns in the Atlanta market, including leadership making fun of Will Pichardo's accent, the banana incident, and minority employees not being given the same opportunities for growth. Her attempt to discuss this with Ms. Nemitz and Ms. Edwards was not well-received.

85.

When the new HR Business Partner position was posted about a week later, it was changed to be based out of Arizona instead of Atlanta. Ms. Nemitz told Luna that Ms. Edwards had decided to change the position to Arizona.

86.

This change was purposefully done to deny Luna the opportunity to apply for the promotion, in retaliation for her raising concerns about the racism in the Atlanta office just a week prior.

87.

The position was filled later that month with a white woman.

88.

Additionally, Progress Residential retaliated against Luna for her complaints about race discrimination by denying her a yearly performance evaluation and rightful raise and bonus.

89.

Luna's annual performance review was due to be completed in November 2019. However, she never received it from Ms. Nemitz and her repeated requests for the review and recommendation were ignored.

90.

Finally, a month and a half later on December 31, 2019, Ms. Nemitz contacted Luna for a two-minute phone call. Despite Luna meeting or exceeding all performance standards and efficiently performing the work for multiple positions, Ms. Nemitz told Luna that her recommended 5% increase had been denied.

91.

Despite being previously told by Ms. Nemitz that she was owed a significant salary increase due to the additional workload and travel that she had taken on after Ms. Carpenter left the company, Luna only received a $.95/hour raise with no explanation as to the merits.

92.

Similarly, in late 2019, Venisee was also due for her performance review, and merit increase and bonus. Venisee's supervisor Ms. Rupar initially proposed a very strong rating in her draft review due to Venisee's high performance.

93.

However, in retaliation for Venisee notifying management about harassment and race discrimination, Ms. Edwards instructed Ms. Rupar to falsify and reduce Venisee's ratings. As a result, Venisee was improperly denied her performance review, her 5% merit raise, and 10% bonus.

94.

A few months later during the spring of 2020, Ms. Nemitz informed Venisee that Mr. Cummings was looking for a way to get rid of her.

95.

Based on the demeaning way that Ms. Shelton and Ms. Krenson continued to treat Venisee, it is evident that they wanted to remove anyone who would report discrimination against minority employees, and it is especially evident that upper management did not want a Black person in the HR department.

96.

In May 2020, Luna was hospitalized due to COVID-19. On May 19, before she could return to work and while she was still hospitalized on a ventilator, the Company sent her an email informing her that she was no longer needed due to a decreased workload, and was terminated without warning. At that time, Luna was the second most senior employee in the Atlanta Human Resources department. Despite the claiming that there was a decreased workload, Progress Residential hired well over one hundred employees since Luna's termination, including at least one in a position for which she was well qualified.

97.

When Luna was hospitalized with COVID-19, she had a serious health condition under the FMLA.

98.

Despite the Company's knowledge of her serious health condition and hospitalization, Progress Residential never offered Luna FMLA leave or informed her of her rights under that law, including to reinstatement.

99.

Progress Residential denied Luna rights to which she was entitled under the FMLA, including to job-protected leave and reinstatement to the same or a similar position.

100.

Instead of granting her leave or reinstating her as required under the FMLA, Progress Residential terminated Luna's employment on May 19, 2020.

101.

Two days later, on May 21, 2020, Progress Residential terminated Venisee's employment without warning and with no explanation as to the reason. At that time, Venisee was the most senior employee in the Atlanta Human Resources department, with the most experience in the field, and strongest performance record.

102.

Other than two other employees with well-known and documented performance issues, Plaintiffs Venisee and Luna were the only employees let go from their department. Defendant instead retained much more junior team members, including two untrained employees who had been with the Company less than two months, and another who was brought on as a temporary contractor.

103.

Shortly before Progress Residential terminated Venisee's employment, she had become ill and was under a tentative cancer diagnosis with ongoing diagnostic testing.  Progress Residential had knowledge of this information because Venisee had informed Ms. Nemitz, among others.

104.

Ms. Nemitz specifically refrained from participating in the phone call when Progress Residential terminated Venisee's employment because of her knowledge of Venisee's health condition.

105.

Venisee and Luna both participated in Progress Residential's group health insurance plan through United Healthcare.

106.

Progress Residential knew that Venisee's cancer treatment would impose significant costs under its group health insurance plan and knew that she would need leave under the FMLA for her illness.

107.

Progress Residential also knew that Luna's COVID treatment would impose significant costs under its group health insurance plan.

108.

In addition to terminating their employment for discriminatory and retaliatory reasons that are prohibited by Title VII, Progress Residential also terminated the employment of each of Luna and Venisee in order to reduce or avoid costs under its group health insurance plan, in violation of ERISA, and to interfere with their FMLA rights.

## COUNT I
## RACE DISCRIMINATION IN VIOLATION OF
## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

109.

Plaintiffs incorporate by reference all of the preceding paragraphs of the Complaint.

110.

Plaintiffs were protected by Title VII of the Civil Rights Act of 1964 due to their race (African American).

111.

During their employment, Plaintiffs possessed the skills and background necessary to perform the duties of their positions. As such, Plaintiffs were qualified for their positions.

112.

During their employment, Defendant treated Plaintiffs differently and less favorably from similarly situated employees outside the protected class. The disparate treatment of Plaintiffs included, but was not limited to, denying the Plaintiffs advancement opportunities and earned raises and bonuses, removing the Plaintiffs from the Atlanta office and transferring them to remote work without adequate reason or explanation, blatantly informing Plaintiffs that the removal to remote work was due to them not being wanted at the Atlanta location due to their complaints about race discrimination, excluding them from communications and meetings in an effort to make it more difficult for them to do their jobs, and threatening and retaliating against Plaintiffs if they complained about a hostile work environment and race-based discrimination.

113.

The discriminatory actions of Defendant against each of the Plaintiffs, when considered individually or collectively, constitute an adverse employment action for purposes of the Title VII. More specifically, the termination of each Plaintiff's employment constitutes an ultimate employment decision, affected the livelihood and safety of the protected class employees, altered the compensation, terms,

conditions, or privileges of Plaintiffs' employment, and/or adversely affected Plaintiffs' status as employees.

114.

The adverse employment actions were taken because of Plaintiffs' race and/or color. More specifically, Plaintiffs' race and/or color played a motivating factor in the adverse employment actions.

115.

As a proximate result of the aforementioned intentional discriminatory acts of Defendant, through its employees and/or agents, Plaintiffs have suffered damages including but not limited to lost wages, income, and employment benefits; emotional pain, suffering, mental anguish, loss of enjoyment of life; and costs, including attorney's fees.

## COUNT II
## HOSTILE WORK ENVIRONMENT IN VIOLATION OF
## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

116.

Plaintiffs incorporate by reference all of the preceding paragraphs of the Complaint.

117.

Plaintiffs were members of a protected class under Title VII of the Civil Rights Act of 1964 because of their race (African American).

118.

Defendant, through the conduct of a number of its employees, including but not limited to Melissa Bruce, Patricia Shelton and Jennifer Krenson, discriminated against Plaintiffs by creating a hostile work environment based on race.

119.

The harassment that Plaintiffs suffered was sufficiently severe and pervasive to alter the terms and conditions of their employment and create a discriminatorily abusive working environment.

120.

Defendant is liable for the harassment/hostile work environment to which Plaintiffs were subjected because it had knowledge that the harassment was occurring and did not take appropriate corrective action to stop it.

121.

Instead of taking appropriate corrective action in response to the harassment, defendant ultimately fired each of the plaintiffs in an effort to get rid of the problem.

122.

As a proximate result of the aforementioned intentional discriminatory acts of Defendant, through its employees and/or agents, Plaintiffs have suffered damages including but not limited to lost wages, income, and employment benefits; emotional pain, suffering, mental anguish, loss of enjoyment of life; and costs, including attorney's fees.

**COUNT III**
**RETALIATION IN VIOLATION OF**
**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

123.

Plaintiffs incorporate by reference all of the preceding paragraphs of the Complaint.

124.

Plaintiffs engaged in protected activity under Title VII by both opposing actions made unlawful under Title VII, including race discrimination and racial harassment, and by participating in the process of Defendant's superficial investigation of those complaints.

125.

Plaintiffs suffered adverse employment action when Defendant refused to acknowledge and address the disparate treatment that Plaintiffs both reported and

experienced, denied them advancement opportunities for positions in which they were well-qualified for, forced them to work remotely in order to remove them from the Atlanta office, denied them accurate and rightful merit increases and bonuses, and ultimately terminated their employment.

126.

There is a causal connection between Venisee and Luna's protected activity and the adverse employment action each Plaintiff suffered.

127.

Venisee and Luna suffered damages as a direct and proximate result of the adverse action taken against them based on their individual and combined engagement in protected activity, including but not limited to lost wages, income, and employment benefits; emotional pain, suffering, mental anguish, loss of enjoyment of life; and costs, including attorney's fees

## COUNT III
## ERISA INTERFERENCE

128.

Plaintiffs incorporate by reference all of the preceding paragraphs of the Complaint.

129.

Defendant terminated each Plaintiff for the purpose of interfering with her right to exercise her health insurance benefits.

130.

Plaintiffs were entitled to ERISA benefits because each of their health insurance plans qualified as welfare plans under ERISA.

131.

The circumstances surrounding Venisee's termination give rise to an inference of specific intent to deprive her of her health insurance benefits because the termination occurred shortly after she notified Defendant that she was diagnosed with cancer. Immediately following the disclosure of her impending medical treatment and costs, Venisee's employment was terminated.

132.

The circumstances surrounded Luna's termination give rise to an inference of specific intent to deprive her of her health insurance benefits because the termination occurred while she was hospitalized with COVID-19. Immediately following the disclosure of her medical treatment and costs, Luna's employment was terminated.

133.

Defendant violated ERISA by terminating each of the Plaintiff's employment, entitling each of them to all available remedies under that law, including but not limited to reinstatement and attorney's fees and costs.

## COUNT IV
## FMLA INTERFERENCE

134.

Plaintiffs incorporate by reference all of the preceding paragraphs of the Complaint.

135.

Due to the knowledge that Venisee had a cancer-diagnosis, Defendant anticipated that Venisee would need FMLA leave in the near future.

136.

Due to her serious hospitalization with COVID-19, Defendant had the legal obligation to offer and grant FMLA leave to Plaintiff Luna.

137.

Defendant wrongfully failed to offer and grant FMLA leave to Luna, and failed to return her to work, either to the position that she held at the time of her hospitalization or an equivalent position, all in violation of the FMLA.

138.

In avoidance of granting FMLA leave and the prospect of further FMLA leave required in the future, Defendant terminated Plaintiffs Venisee and Luna.

139.

As a result of Defendant's wrongful and retaliatory actions, carried out with malice or reckless indifference, Plaintiffs sustained significant damages in the form of pain, suffering, and anguish, and has also sustained damages in the form of lost wages, lost benefits, and other economic damages. Accordingly, Plaintiffs are entitled to all remedies available under applicable law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand a **TRIAL BY JURY** and request the following relief:

a) A declaratory judgment that Defendant has violated the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq;*

b) A declaratory judgment that Defendant has violated the FMLA, 29 U.S.C. § 2601, *et seq*;

c) A declaratory judgment that Defendant has violated the ERISA, 29 U.S.C. § 1001, *et seq*;

d) A judgment awarding Plaintiffs compensatory and punitive damages, in an amount to be determined by the enlightened conscience of the jury;

e) A judgment awarding Plaintiffs all of their attorney's fees;

f) Award Plaintiffs pre-judgment and post-judgment interest; and

g) Award Plaintiffs all other and further relief as this Court deems just and proper.

Respectfully submitted this 21st day of December, 2021.

/s/ Lisa D. Taylor
Lisa Durham Taylor
Georgia Bar No. 235529
lisa@stembridgetaylor.com
John T. Stembridge
Georgia Bar No. 678605
john@stembridgetaylor.com
**STEMBRIDGE TAYLOR LLC**
3651 Mars Hill Road, Suite 3300
Watkinsville, Georgia 30677
Telephone: (404) 604-2691

Attorneys for Plaintiffs